UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA
*ex rel.*  ALAN M. FREEDMAN, MD,

          Plaintiffs,

v.                                          Case No.  8:04-cv-933-T-24 EAJ

JOSE SUAREZ-HOYOS, MD, ET AL.,

          Defendants.

_____/

## ORDER

This cause comes before the Court on two motions: (1) Defendants Independent Clinical Laboratory doing business as Tampa Pathology Laboratory ("TPL") and Jose SuarezHoyos, M.D.'s ("Suarez") Motion to Dismiss (Doc. No. 14), which the Government opposes (Doc. No. 22), and to which a reply brief has been filed (Doc. No. 75); and (2) Defendants Steven Jay Wasserman, M.D., Steven Jay Wasserman PA, and Dermatology Institute of Venice's (collectively referred to as "Wasserman") Motion to Dismiss (Doc. No. 17), which the Government opposes (Doc. No. 25).

## I.  Standard of Review

In deciding a motion to dismiss, the district court is required to view the complaint in the light most favorable to the plaintiff.  See Murphy v. Federal Deposit Ins. Corp., 208 F.3d 959, 962 (11th Cir. 2000)(citing Kirby v. Siegelman, 195 F.3d 1285, 1289 (11th Cir. 1999)).  The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim.  Instead, Rule 8(a)(2) requires a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the

claim is and the grounds upon which it rests.  See Bell Atlantic Corp. v. Twombly, 127 S. Ct.

1955, 1964 (2007)(citation omitted).  As such, a plaintiff is required to allege "more than labels

and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id.

at 1965 (citation omitted).  While the Court must assume that all of the allegations in the

complaint are true, dismissal is appropriate if the allegations do not "raise [the plaintiff's] right

to relief above the speculative level."  Id. (citation omitted).  The standard on a 12(b)(6) motion

is not whether the plaintiff will ultimately prevail in his or her theories, but whether the

allegations are sufficient to allow the plaintiff to conduct discovery in an attempt to prove the

allegations.  See Jackam v. Hospital Corp. of Am. Mideast, Ltd., 800 F.2d 1577, 1579 (11th Cir.

1986).

## II.  Background

The Government alleges the following in its complaint (Doc. No. 5): In order to obtain

Medicare reimbursement for outpatient treatment, providers must submit claims using forms

known as CMS 1500s.  Within the CMS 1500 form, providers identify the services rendered by

using five digit codes, known as CPT codes.

After reviewing the CPT codes within Defendants' billings to Medicare, the Government

contends that around 1997, Wasserman, a dermatologist, and Suarez, a pathologist and owner of

TPL, entered into a kickback arrangement pursuant to which they submitted tens of thousands of

false claims to the Medicare Program for biopsies, slide preparations, and slide readings.[1]

Additionally, the Government contends that Wasserman also fraudulently billed Medicare for

---

[1]This case was originally filed by the Relator, Alan Freedman, M.D., who was employed
by Suarez and TPL from 2000 through 2003.

patient office visits and adjacent tissue transfers.

### A.  Slide Preparation and Slide Reading

After a dermatologist removes a lesion, the dermatologist may send the specimen to an outside laboratory for the preparation of a slide and a professional reading and diagnosis by the lab's pathologist. In such instances, the lab prepares a pathology report providing a gross and microscopic description of the specimen and a diagnosis.  That pathology report is provided to the dermatologist for inclusion in the patient's medical file.  In that scenario, the dermatologist would be permitted to bill Medicare using CPT code 11000 for the biopsy (the removal of the lesion), and the lab would be permitted to bill Medicare using CPT code 88305 for the technical preparation of the slide and the professional reading of the slide.  A CPT code 88305 claim without any modifiers is referred to as a global code, because it indicates that the provider submitting the claim (in this scenario the lab) performed both the technical (slide preparation) and professional (slide reading) components involved in the surgical pathology.

Some dermatologists opt to use a lab to prepare the slide and elect to perform the professional reading of the slide themselves. In these instances, the lab is permitted to bill Medicare using CPT code 88305-TC. The TC modifier indicates that the lab only performed, and is only billing Medicare for, the technical component (the slide preparation).  The dermatologist who reads the slide would be allowed to bill Medicare using CPT code 88305-26.  By using the 26 modifier in this instance, the dermatologist indicates that he performed the professional component (the reading of the slide and the diagnosis of the specimen).

The Government contends that around 1997, Suarez and Wasserman reached an agreement in order to increase Wasserman's referrals of Medicare patients to TPL.  Pursuant to

their arrangement, Wasserman would send TPL a biopsy specimen he had excised from a patient for testing. TPL would prepare a slide, and a TPL pathologist would interpret the slide and prepare a pathology report with a diagnosis. TPL would provide that report to Wasserman. This work entitled *TPL* to bill Medicare using the global 88305 code.  However, in an effort to increase the number of Medicare referrals Wasserman made to TPL, Suarez and TPL allowed *Wasserman* to bill Medicare for the professional component for the specimen, even though he did not do the work that would permit him to seek such reimbursement.  Defendants were aware that their arrangement violated the Anti- Kickback Statute ("AKS") and that the claims they submitted to the Centers for Medicare and Medicaid Services ("CMS") pursuant to their arrangement were not entitled to reimbursement.

Furthermore, Defendants took affirmative steps to hide the fraud from CMS, such as by redacting the pathology reports that they sent to CMS to substantiate their reimbursement requests. For example, the pathology reports that were prepared for Wasserman by TPL contained a signature block for Wasserman, in order to suggest that he had interpreted the slide and drafted the report. On several occasions, both TPL and Wasserman submitted to CMS pathology reports for the agency's review, but the reports TPL submitted had been redacted by TPL to remove the diagnosis and Wasserman's signature block, while the reports submitted by Wasserman contained the diagnosis and his signature block.  This was done to mislead CMS to believe that Wasserman was performing the professional component of the surgical pathology for which he was billing the Medicare program, when, in fact, Defendants knew that it was TPL that had performed the service.

In furtherance of their kickback arrangement, Wasserman also sent TPL specimens taken

4

from patients who were not Medicare beneficiaries. On numerous occasions, TPL would perform both the technical and professional components on these specimens and would allow Wasserman to bill the patient's private insurance for the global fee.  TPL offered Wasserman this remuneration as further inducement to Wasserman to send his Medicare eligible referrals to TPL in violation of the AKS.

Defendants' kickback scheme resulted in a substantial financial benefit to Wasserman. Medicare reimbursed Wasserman nearly $50 on average for each slide he claimed to have read, and private insurers paid him nearly twice that for the global fee he billed them.    Suarez and TPL also benefitted from the scheme, because Wasserman dramatically increased the number of biopsies he performed and the Medicare referrals he sent to TPL. Thus, even though the scheme required TPL to forego Medicare's $50 payment per specimen for the professional component and nearly $100 payment for global services from private insurers, the increase in Medicare referrals Wasserman provided as a result made the deal valuable to TPL and Suarez.

From 2000 through 2005, pursuant to this kickback arrangement, Wasserman submitted more than 35,700 claims using CPT code 88305-26 and received more than $3.5 million in reimbursement from Medicare. In addition, over that same time period, TPL submitted the same number of claims using CPT code 88305-TC, amounting to more than $3.9 million of reimbursement by Medicare.

The Government contends that Wasserman did not perform the professional component for any of these claims, and as such, he was not entitled to reimbursement for any of the claims, making all of the claims false claims and violative of the False Claims Act ("FCA").  In addition, the Government contends that each of the aforementioned claims submitted by Defendants

5

resulted from an arrangement that violated the AKS, and as such, none of the claims submitted by either Wasserman or TPL were eligible for reimbursement.  Thus, the Government contends that all of the claims submitted as a result of the arrangement were ineligible for payment and were false claims that violated the FCA.

### B.  Biopsies

CPT code 11100 is used to bill for the first biopsy performed on a patient during a visit. CPT code 11101 is used to bill for every additional biopsy performed on the same patient during that visit.  As previously explained, the Government contends that Wasserman received a substantial kickback for every biopsy specimen he sent to TPL for diagnosis.  As a result of this financial incentive, Wasserman increased the number of biopsies he performed on his patients after he entered into the agreement by performing medically unnecessary biopsies.  In 1997, the year in which Wasserman and TPL entered into the kickback agreement, the number of biopsies Wasserman performed nearly doubled from what he had performed annually in each of the previous six years.

### C.  Evaluation and Management Services

Providers also bill Medicare for the time that they spend with a patient for evaluation and management ("E/M") services during an office visit.  These E/M services vary with respect to, among other factors, the time the physician spends with the patient, as well as the complexity and severity of the health-related issues addressed by the physician.

To bill Medicare for E/M services provided to an existing patient, physicians must choose one of five CPT codes: 99211, 99212, 99213, 99214, or 99215.  Physicians, on average, spend 15 minutes of face-to-face time with the patient for services they bill using CPT code

6

99213.  When physicians bill using CPT Code 99214, they have spent, on average, 25 minutes of face-to-face time with the patient during the office visit.

CMS recognizes that patient consultation regarding medical procedures to be performed often occurs during the office visits, and as such, CMS has built this consultation time into its reimbursement scheme for the procedures.  Therefore, CMS does not permit physicians to bill such consultation time as E/M services unless the patient's condition required a significant, separately identifiable E/M service above and beyond the usual pre-service and post-service care associated with the procedure that was performed.  When significant, separately identifiable E/M service is performed, the physician may bill the E/M services rendered separate from the procedure by attaching a 25 modifier to the appropriate E/M CPT code.

From 2000 through 2008, Wasserman billed Medicare for 37,467 patient office visits using either the 99213 or 99214 CPT code. These claims resulted in payments to Wasserman of more than $1.9 million.  However, the Government contends that the number of hours Wasserman would have had to have spent in order to have performed just the E/M services for which he billed Medicare demonstrates the fraud that his billing of such claims represents.[2] As such, the Government contends that Wasserman should not have received any reimbursement from Medicare for roughly 80% of these claims and that he knew he was not entitled to reimbursement, but he filed the claims anyway, which rendered the claims false and in violation of the FCA.

---

[2]The Government identifies several dates on which the services for which Wasserman billed for the day would have taken more than 24 hours to complete, despite the fact that his employees and office records confirm that his practice was only open for about 12 hours per day.

### D.  Adjacent Tissue Transfers

When a dermatologist excises a lesion, the process creates an opening in the patient's skin. Sometimes this opening requires a complicated and time-consuming procedure, called an adjacent tissue transfer, to close.  CMS assigns different CPT codes to adjacent tissue transfers based on the location of the transfer on the patient's body and the size of the opening being repaired.

CPT codes 14020 and 14021 are used when the adjacent tissue transfer is performed on a patient's scalp, arms, and/or legs. The difference between a 14020 and a 14021 procedure is the size of the opening, with a 14020 procedure consisting of a transfer with an opening of less than 10.1 cm, while a 14021 procedure is defined as a transfer with an opening greater than 10.1 cm.  On average, a physician will spend more than 3.5 hours of time for a procedure billed using CPT code 14021.

CPT codes 14040 and 14041 are used when the adjacent tissue transfer is performed on a patient's face, neck, genitalia, hands, and/or feet.  The difference between a 14040 and a 14041 procedure is the size of the opening, with a 14040 procedure consisting of a transfer with an opening of less than 10.1 cm, while a 14041 procedure is defined as a transfer with an opening greater than 10.1 cm.  On average, a physician will spend more than 5 hours of time for a procedure billed using CPT code 14041.

The Government contends that since at least 2000, Wasserman engaged in a scheme where he would submit claims to Medicare for either a 14041 or a 14021 procedure, knowing that at most he had performed a 14040 or a 14020 procedure. The Government contends that as a result of these knowing misrepresentations to the Medicare program, Wasserman received on average roughly $150 more per claim than he would have received had he billed for a 14040 or 14020 procedure.  Between 2000 and 2008, Wasserman submitted claims for 6,543 such procedures, for which he received $4,186,341 in Medicare reimbursement.

8

The Government contends that the frequency at which Wasserman claimed to have performed adjacent tissue transfers since 2000 is evidence of his fraudulent billing scheme. Specifically, in the six years between 2000 and 2005, there were more than 130 days on which Wasserman billed Medicare for at least 11 such procedures, plus numerous additional, time-consuming procedures as well.  A review of the claims he submitted between October 2004 and June 2005 indicates that he billed Medicare for these procedures at least 36 times more often than his peers.  Furthermore, the Government contends that the number of hours Wasserman would have had to have spent in order to have performed just the adjacent tissue transfers for which he billed Medicare illustrates the fraud underlying his billing scheme.[3]  Therefore, the Government contends that these were false claims that violated the FCA.

### E.  The Complaint

As a result of Defendants' conduct, the Government filed a six-count complaint.  The Government asserts the following claims against Defendants: (1) presentation of false claims regarding the pathology work, biopsies, E/M services, and adjacent tissue transfers; (2) presentation of false statements relating to the pathology work, biopsies, E/M services, and adjacent tissue transfers; (3) conspiracy to defraud the United States; (4) unjust enrichment; (5) payment by mistake; and (6) overpayment.  In response, all of the defendants have moved to dismiss the complaint.

### III.  Motions to Dismiss

Motions to dismiss were filed by the Wasserman defendants and by Suarez and TPL.

---

[3]The Government identifies several dates on which the surgical time billed per day would have taken much longer than 24 hours to complete, despite the fact that his employees and office records confirm that his practice was only open for about 12 hours per day.

9

Accordingly, the Court will address each motion.

### A.  Suarez and TPL's Motion to Dismiss

Suarez and TPL have moved to dismiss the claims against them, arguing that the Government has failed to state a claim.  Specifically, these defendants argue: (1) the allegations fail to meet the plausibility and particularity standards of Rule 8(a)(2) and Rule 9(b); (2) the Government has improperly grouped the claims; (3) the Government has failed to adequately allege that TPL acted willfully and with bad intent to violate the AKS; and (4) the Government fails to state a claim pursuant to a certification theory of FCA liability.  Accordingly, the Court will analyze each argument.

### 1.  Plausibility and Particularity

Suarez and TPL argue that the claims against them should be dismissed because the allegations fail to meet the plausibility and particularity standards of Rule 8(a)(2) and Rule 9(b).[4] Specifically, Suarez and TPL argue that the Government's allegations lack the requisite specificity regarding the alleged agreement between them and Wasserman.  Furthermore, they contend that the allegations are equally consistent with a lawful explanation of their conduct. Additionally, they argue that the Government's allegations regarding the billing of private insurance are insufficient and that the allegations regarding the increase in Medicare referrals to TPL is unsupported.  As explained below, these arguments have no merit.

### a.  Allegations Regarding the Agreement

The Court rejects Suarez and TPL's argument that the Government's allegations lack the

---

[4]Claims for violations of the FCA must comply with the pleading standards set forth in Rule 9(b).  See U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc., 290 F.3d 1301, 1309-10 (11th Cir. 2002).

requisite specificity regarding the alleged agreement between them and Wasserman.

Specifically, the Court notes that the Government gave the date of the agreement (1997), the

parties to the agreement, the substance of the agreement (that TPL would perform the

professional component and allow Wasserman to bill for it in return for Wasserman sending

additional Medicare referrals to TPL), the purpose of the agreement (Wasserman benefitted by

getting payment for work he did not perform, and Suarez and TPL benefitted by getting an

increased amount of Medicare referrals from Wasserman), and how the object of the agreement

was executed (TPL would read the slides, prepare a diagnosis, and send a report with

Wasserman's signature block to Wasserman for him to sign; TPL would submit a redacted

version of the report to CMS when billing for the technical component, and Wasserman would

submit an un-redacted version of the report to CMS when billing for the professional

component).  Furthermore, since the Relator was an employee of Suarez and TPL during part of

the relevant time period, the Government's allegations are based on the Relator's first-hand

knowledge regarding TPL's conduct.

### b.  Alternative Explanations for TPL and Suarez's Conduct

Likewise, the Court rejects Suarez and TPL's argument that the allegations do not refute

their position that they did not know that Wasserman was not actually performing the

professional component for which he billed.  This argument is refuted by the detailed allegations

in the complaint regarding an agreement by the parties wherein TPL would perform the

professional component and allow Wasserman to bill for it.

Additionally, the Court rejects Suarez and TPL's argument that the allegations in the

complaint are equally consistent with a lawful explanation of their conduct.  They contend that

based on <u>U.S. v. Reddy</u>, 2010 WL 3210842 (N.D. Ga. April 5, 2010), it would be appropriate for Wasserman to bill for the professional component even if TPL had prepared a draft report with a preliminary diagnosis for Wasserman's review, as long as Wasserman actually reviewed the slides and adopted the preliminary diagnosis as his own.[5]

The Court finds Suarez and TPL's reliance on <u>Reddy</u> to be misplaced, because the Government has alleged in the complaint that Wasserman did not review the slides.  Specifically, the Government alleges in the complaint that Wasserman would send the biopsy to TPL, a TPL pathologist would prepare and review the slide and prepare a pathology report with a diagnosis, TPL would send the report to Wasserman, and Wasserman would bill for the professional component "even though he did not do the work that would permit him to seek such reimbursement."  (Doc. No. 5, ¶ 33).

### c.  Billing Private Insurance

Suarez and TPL also argue that during the relevant time period, there are circumstances in which it would have been appropriate for TPL to perform the technical component and have Wasserman bill private insurance for the technical component and then remit the payment to TPL.  As such, Suarez and TPL argue that the Government's allegations regarding the billing of private insurance are insufficient, because the allegations do not make clear that it was not

---

[5]In <u>Reddy</u>, the defendant was charged with fraud with respect to a radiology company that he owned.  <u>See</u> <u>Reddy</u>, 2010 WL 3210842, at *2.  Specifically, the government had alleged in the indictment that the radiology company employed radiology technicians who were not physicians and who could not render clinical findings or diagnoses, and the defendant submitted the technicians' radiology reports on behalf of the company to its clients without having a physician review the reports first.  <u>See</u> <u>id.</u>  The government contended that this practice violated the appropriate standard of care for performing a legitimate physician's service, because there were no physicians reviewing the technicians' reports and the underlying images and data in order to confirm the accuracy of the reports and/or edit the reports as necessary.  <u>See</u> <u>id.</u> at *3.

appropriate for Wasserman to bill for the technical component and then remit the payment to TPL, and there is no allegation that the payments were not remitted to TPL.

The Government did not address this argument in their response brief.  However, the Court notes that even accepting Suarez and TPL's argument on this issue, their argument only goes towards the billing of the technical component and does not address Wasserman's billing of the professional component.  Furthermore, even if the Court disregarded all of the allegations relating to the billing of private insurance, there would still remain sufficient allegations relating to the billing of Medicare to support the Government's claims in this case.

**d.  Increase in Medicare Referrals to TPL**

The Court also rejects Suarez and TPL's argument that the Government's allegations regarding the increase in Medicare referrals to TPL is unsupported.  While Suarez and TPL argue that some sort of analysis of the actual number of referrals to TPL both before and after 1997 must be contained in the complaint, such is not required by the applicable pleading standards.

**2.  Grouping of Claims**

Next, Suarez and TPL argue that the claims against them should be dismissed because the Government has improperly grouped the claims.   Specifically, Suarez and TPL argue that the Government should not have grouped allegations that involve them (the allegations regarding the slide preparation and slide reading) with the allegations that do not involve them (the allegations regarding the E/M services and adjacent tissue transfers) within the same count.  The Court rejects this argument, as there is nothing improper regarding the grouping of the claims in this case.

13

### 3.  Willfulness and Intent to Violate the AKS

Next, Suarez and TPL argue that the claims against them should be dismissed because the Government has failed to adequately allege that TPL acted willfully and with bad intent to violate the AKS.  The Court finds that this argument has no merit, as the allegations in the complaint sufficiently describe TPL's actions as being done willfully and with the intent to violate the AKS.

### 4.  Certification Theory of FCA Liability

Next, Suarez and TPL argue that the claims against them should be dismissed because the Government fails to state a claim pursuant to a certification theory of FCA liability.   The Court rejects this argument.

The Government has alleged in the complaint that: (1) compliance with the AKS is a prerequisite for receiving payment from the Medicare program; (2) Defendants were aware that their arrangement violated the AKS, and as such, they were not entitled to receive payment for their claims from Medicare; and (3) despite this knowledge, they submitted claims to Medicare that they knew were not entitled to payment.  These allegations are sufficient to state a claim for FCA liability based on the theory of implied false certification.

The implied false certification theory is explained as follows: "[W]here the government pays funds to a party, and would not have paid those funds had it known of a violation of a law or regulation, the claim submitted for those funds contained an implied certification of compliance with the law or regulation and was fraudulent."  See U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F. Supp.2d 28, 33 (D.D.C. 2003)(citation omitted); see also U.S. ex rel. Compton v. Circle B Enterprises, Inc., 2010 WL 942293, at *7 (M.D. Ga. Mar.

11, 2010).  Furthermore, the Eleventh Circuit in <u>McNutt v. Haleyville Medical Supplies, Inc.</u>, 423 F.3d 1256 (11th Cir. 2005), found allegations similar to those set forth in the complaint in this case to sufficiently state a claim for FCA liability.

In <u>McNutt</u>, the government alleged that Medicare providers are required to enter into provider agreements in which they certify that they will comply with all relevant laws, including the AKS, and that such compliance is a precondition to receipt of Medicare payments.  <u>See</u> <u>id.</u> at 1258.  The <u>McNutt</u> court concluded that a violation of the AKS could form a basis for an FCA claim, because the defendant's failure to comply with the AKS disqualified it from receiving Medicare payments.  <u>See</u> <u>id.</u> at 1259.  The <u>McNutt</u> court reasoned that "[w]hen a violator of government regulations is ineligible to participate in a government program and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the [FCA], for its submission of those false claims."  <u>Id.</u>

Suarez and TPL argue that <u>McNutt</u> is distinguishable because the defendant in <u>McNutt</u> did not dispute that if it had not complied with the AKS it would be disqualified from receiving Medicare payments, whereas in the instant case, they do not make such a concession.  The Court finds this argument unpersuasive and finds <u>McNutt</u> to be instructive in this case.  <u>See</u> <u>also</u> <u>U.S. ex rel. Pogue v. American Healthcorp, Inc.</u>, 914 F. Supp. 1507, 1509 (M.D. Tenn. 1996)(noting that there are cases to support the argument that a violation of the AKS constitutes a violation of the FCA).

**5.  Conclusion**

Accordingly, the Court rejects all of Suarez and TPL's arguments that the complaint should be dismissed.  As such, their motion to dismiss is **DENIED**.

15

### B.  Wasserman's Motion to Dismiss

The Wasserman defendants have also moved to dismiss the claims against them, arguing that the Government has failed to state a claim.  Like Suarez and TPL, the Wasserman defendants argue: (1) the Government fails to state a claim pursuant to a certification theory of FCA liability; and (2) the Government failed to adequately allege a conspiracy or that Wasserman acted willfully.  The Court rejects these arguments for the same reasons that it rejected Suarez and TPL's similar arguments.

Additionally, the Wasserman defendants argue: (1) the Government fails to adequately allege a factual basis for damages; (2) there is no violation of the AKS, because the alleged benefit of the kickback scheme does not constitute remuneration under the AKS; (3) Wasserman did work entitling him to bill for the reading of the slides; (4) the alleged kickback violations fall outside of the statute of limitations; and (5) the Government fails to adequately allege a factual basis for its claims relating to Wasserman's billing for E/M services and adjacent tissue transfers.  Accordingly, the Court will analyze each of these arguments.

### 1.  Damages

Wasserman argues that the Government fails to adequately allege a factual basis for damages.  In support of this contention, Wasserman makes three arguments, all of which have no merit.

First, Wasserman argues that there is no basis in the complaint to support a certification theory of liability under the AKS, and as such, there can be no damages.  This Court has already found that the complaint adequately alleges an implied false certification theory of liability under

the AKS.  Therefore, the Government has sufficiently alleged damages, in that the Government was damaged when it paid the claims that resulted from the kickback arrangement between Wasserman, Suarez, and TPL, because such claims were false claims that were not entitled to payment.

Second, Wasserman argues that there is no factual basis in the complaint to support the allegation that he performed medically unnecessary biopsies, and therefore, such cannot support a claim that the Government was damaged.  The Court rejects this argument, as the Government has alleged that as a result of the kickback arrangement, "Wasserman increased the number of biopsies he performed on his patients . . . by performing medically unnecessary biopsies" and that the number of biopsies that he performed "nearly doubled."  (Doc. No. 5).  The Court finds that the Government has sufficiently alleged that Wasserman performed medically unnecessary biopsies, and as such, the Government's payment of claims relating to the unnecessary biopsies constituted damages to the Government.

Third, Wasserman argues that there is no factual basis in the complaint to support the allegation that Wasserman was not entitled to bill Medicare for his review of the slides that TPL prepared, and therefore, such cannot support a claim that the Government was damaged.  The Court rejects this argument, because the Government does not allege in the complaint that Wasserman ever reviewed the slides.  Instead, the Government alleges that Wasserman billed Medicare for reviewing the slides "even though he did not do the work that would permit him to seek such reimbursement."  (Doc. No. 5).  Therefore, the Government has sufficiently alleged that Wasserman billed Medicare for work he did not perform, and as such, the Government's payment of his claims constituted damages to the Government.

## 2.  Remuneration

Next, Wasserman argues that there is no violation of the AKS, because the alleged benefit of the kickback scheme does not constitute remuneration under the AKS.  The AKS prohibits "knowingly and willfully solicit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . in return for referring an individual to a person for the furnishing[,] or arranging for the furnishing[,] of any . . . service for which payment may be made" by Medicare.  42 U.S.C. § 1320a-7b(b)(1)(A).  Thus, Wasserman contends that Suarez and TPL's provision of pathology reports, for which Wasserman billed Medicare, is not remuneration under the AKS.

In support of this argument, Wasserman cites to U.S. v. Capital Group Health Services of Florida, Inc., 2005 WL 1364619 (N.D. Fla. June 7, 2005).  In Capital Group, the plaintiff alleged that a doctor and HMO had an illegal kickback arrangement, wherein the HMO would refer patients to the doctor, and in return, the doctor did not hospitalize all of the patients that required hospitalization in an effort to reduce hospitalization costs for the HMO.  See id. at *4.  The court rejected the plaintiff's argument that the alleged failure to hospitalize patients could constitute remuneration under the AKS.[6]  See id.

To the extent that the Capital Group case could be viewed to support Wasserman's position that TPL's provision of pathology reports to Wasserman is not remuneration under the AKS, this Court respectfully disagrees and notes that it is not bound by the Capital Group case.

---

[6]The Capital Group court stated that it is a legitimate goal for HMOs to strive to reduce excessive utilization of medical services, and as such, it is appropriate for HMOs to choose doctors that they believe will further that goal.  2005 WL 1364619, at *4.

Instead, this Court is persuaded by the analysis set forth in U.S. ex rel. Westmoreland v. Amgen, Inc., 738 F. Supp.2d 267 (D. Mass. 2010).

In Amgen, the plaintiff alleged that the defendants induced providers to purchase the medication, Aranesp, by giving the providers a kickback.  See id. at 271.  Specifically, the plaintiff alleged that the defendants overfilled the vials with Aranesp and then sold those vials to providers while advocating that the providers could use the excess, "free sample" dosage and bill Medicare for it.  See id.  The defendants argued that the overfill could not be considered remuneration under the AKS, and the court rejected the argument, stating: "Under the anti-kickback statute, "remuneration" is broadly defined as "transfers of items or services for free or for other than fair market value." 42 U.S.C. § 1320a-7a(i)(6).  Excess overfill is in effect free doses of Aranesp, which create the potential for providers to profit from Medicare reimbursement."  Id. at 273-74.

Likewise, in the instant case, the Government has alleged that Suarez and TPL's gratuitous provision of pathology reports was done to induce Wasserman to refer its Medicare patients to TPL.  Pursuant to Amgen, the provision of "free" pathology reports is remuneration under the AKS.

Wasserman also argues that the provision of pathology reports cannot be deemed remuneration under 42 U.S.C. § 1320a-7b(b)(1)(A), because that statute does not contain the same definition of remuneration as that statute's civil counterpart, 42 U.S.C. § 1320a-7a. Specifically, § 1320a-7a(i)(6) defines remuneration to include "transfers of items or services for free or for other than fair market value," while § 1320a-7b does not define remuneration.  The Court is not persuaded by this argument, given that the Amgen court applied the definition of

remuneration in § 1320a-7a(i)(6) when analyzing the kickback claim asserted under § 1320a-7b(b)(1)(A).[7]

### 3.  Billing for Reading the Slides

Next, Wasserman argues that he did work entitling him to bill for the reading of the slides, because he supervised the slide interpretations done by TPL's pathologists.  The flaw in this argument is that there is no allegation in the complaint that Wasserman supervised, or in any way participated in, the production of the pathology reports.  In fact, the Government specifically alleges that Wasserman billed Medicare for reviewing the slides "even though he did not do the work that would permit him to seek such reimbursement."  (Doc. No. 5).  Since a motion to dismiss is not the proper vehicle for challenging the accuracy of factual allegations contained in the complaint, Wasserman's argument that he was, in fact, entitle to bill for the slide readings is rejected.

### 4.  Statute of Limitations

Next, Wasserman argues that the alleged kickback violations fall outside of the six year statute of limitations period, as set forth in 31 U.S.C. § 3731(b), because the Government did not file its complaint until October 25, 2010.  Since the Government's complaint is based on conduct that occurred prior to 2004 (i.e., six years earlier), Wasserman argues that the claims must be dismissed as time-barred.

Furthermore, Wasserman argues that the Government's complaint cannot relate back to

---

[7]Furthermore, the Court notes that the Government argues that the remuneration in this case can be considered either the gratuitous provision of pathology reports or the Medicare payments themselves, since, in essence, TPL's conduct is equivalent to billing Medicare for the slide reading and then writing Wasserman a check for the amount of the Medicare payment that TPL received.

the Relator's complaint, which was filed on April 27, 2004 (and would make the claims timely since they are based on conduct that occurred less than six years earlier–after April 27, 1998), under Federal Rule of Civil Procedure 15(c).  Wasserman contends that relation back would be inequitable, because the Relator's complaint was filed under seal, and relation back is based on the theory that the defendant had notice of the claims, such that relation back does not cause prejudice.

The flaw in Wasserman's argument, as the Government points out, is that 31 U.S.C. § 3731(c) expressly provides that if the Government intervenes and files an amended complaint, then the amended complaint relates back to the date of the Relator's complaint for statute of limitations purposes, to the extent that the claims of the Government arise out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the Relator's complaint. While § 3731(c) was added as part of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), the Act contains a note that provides that § 3731(c) applies to cases pending on the date of its enactment.  See FERA, Pub. L. No. 111-21, § 4(f)(2), 123 Stat. 1617, 1625.  Since this case was pending on the date of the enactment of FERA and the Government's claims arise out of the same conduct, transactions, or occurrences set forth, or attempted to be set forth, in the Relator's complaint, the Government's claims relate back and are timely.  See U.S. ex rel. Miller v. Bill Harbert Int'l Construction, Inc., 608 F.3d 871, 878 (D.C. Cir. 2010); U.S. ex rel. Frascella v. Oracle Corp., 2010 WL 4623793, at *10 (E.D. Va. Nov. 2, 2010).

### 5.  Billing for E/M Services and Adjacent Tissue Transfers

Next, Wasserman argues that the Government fails to adequately allege a factual basis for its claims relating to Wasserman's billing for E/M services and adjacent tissue transfers.

21

This conclusory argument has no merit, as the Court finds that the Government has adequately alleged that Wasserman knowingly and falsely up-coded the type of E/M services and adjacent tissue transfers when billing Medicare.

### 6.  Conclusion

Accordingly, the Court rejects all of the Wasserman defendants' arguments that the complaint should be dismissed.  As such, their motion to dismiss is **DENIED**.

### IV.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1)      Defendants Suarez and TPL's Motion to Dismiss (Doc. No. 14) is **DENIED**.

(2)      Wasserman's Motion to Dismiss (Doc. No. 17) is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, this 18th day of March, 2011.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
All Parties and Counsel of Record