**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
_____

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* ) | |
| **ALAN M. FREEDMAN, MD** ) | **Civil Action No. 8:04-cv-933-T-24EAJ** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **JOSE SUAREZHOYOS, MD** ) | **DEMAND FOR JURY TRIAL** |
| **INDEPENDENT CLINICAL** ) | |
| **LABORATORIES, d/b/a TAMPA** ) | |
| **PATHOLOGY LABORATORY** ) | |
| ) | |
| **STEVEN JAY WASSERMAN, MD** ) | |
| **STEVEN JAY WASSERMAN, PA** ) | |
| **STEVEN JAY WASSERMAN, M.D., PL** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

## UNITED STATES' AMENDED COMPLAINT

The United States brings this action to recover losses from false claims submitted to the

Medicare program as a result of the sustained fraudulent course of conduct of the defendants,

Steven Jay Wasserman, MD, Steven Jay Wasserman, PA, and Steven Jay Wasserman, M.D., PL

(collectively "Wasserman") and José SuarezHoyos and Independent Clinical Laboratories, Inc.,

doing business as Tampa Pathology Laboratory, (collectively "SuarezHoyos" or "TPL").  In or

around 1997, Wasserman, a dermatologist practicing in Venice, Florida, and SuarezHoyos, a

pathologist and owner of TPL, entered into kickback arrangement pursuant to which defendants

submitted tens of thousands of false claims to the Medicare program.

Wasserman also billed Medicare for evaluation and management ("E/M") services (*i.e.*, patient office visits) and for adjacent tissue transfers – a complicated and time consuming procedure used to repair a sizeable skin defect – that were not supported by the patient files he kept and thus did not qualify for reimbursement.  Indeed, the frequency with which Wasserman billed these services is inconsistent with his actually having performed all of the procedures for which he billed Medicare and with the medical necessity of such procedures to the extent they were actually performed.  For example, on numerous occasions Wasserman submitted claims for services that would have required more than 24 hours of physician time in a single day.

Each of the aforementioned claims submitted by or caused to be submitted by defendants violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*.

## I.    NATURE OF ACTION

1.    The United States brings this action to recover treble damages and civil penalties under the FCA and to recover damages and other monetary relief under the common law or equitable theories of unjust enrichment, payment by mistake, and overpayment.

2.    The United States bases its claims on defendants submitting and causing to be submitted false or fraudulent claims to the Medicare program in violation of 31 U.S.C. § 3729(a)(1).

3.    Within the time frames detailed below, defendants knowingly submitted or caused to be submitted thousands of claims to Medicare for reimbursement, which resulted in millions of dollars of reimbursement that would not have been paid but for defendants' fraud.  In addition, the kickback arrangement between Wasserman and TPL violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS") and, therefore, the claims submitted as part of that scheme were not entitled to reimbursement and, thus, violated the FCA, as well.

## II.  JURISDICTION AND VENUE

4.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345.

5.  This Court may exercise personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a) and because defendants reside and transact business in the Middle District of Florida.

6.  Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because defendants reside and transact business in this District.

## III.  PARTIES

7.  The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration), which administers the Medicare program.

8.  Relator Alan M. Freedman ("Freedman") is a resident of Hillsborough County, Florida.  In May 2004, Freedman filed an action alleging violations of the FCA on behalf of himself and the United States Government pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1).

9.  Defendant Steven Jay Wasserman, MD is a physician licensed to practice medicine in Florida doing business at 1111 Avenida Del Circo, Venice Florida 34285.

10.  Defendant Steven Jay Wasserman, PA is an inactive Florida professional association doing business at 1111 Avenida Del Circo, Venice Florida 34285.

11.  Defendant Steven Jay Wasserman, M.D., PL  is a Florida limited liability company doing business at 1111 Avenida Del Circo, Venice Florida 34285

12.  Defendant José SuarezHoyos, MD is a physician licensed to practice medicine in Florida doing business at 6515 North Armenia Avenue, Tampa, Florida 33604.

13.     Defendant Independent Clinical Laboratories, Inc., doing business as Tampa Pathology Laboratory, is a Florida corporation doing business at 6515 North Armenia Avenue, Tampa, Florida 33604.

## IV.     THE LAW

### A.     The False Claims Act

14.     The FCA, 31 U.S.C. §§ 3729-33, provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States Government.  31 U.S.C. § 3729(a)(1).[1]

15.     The FCA provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or] (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid:
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .
>
>  (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

---

[1] On May 20, 2009, the Fraud Enforcement and Recovery Act of 2009 (FERA), P.L. 111-21, became law.  Section 4 of FERA revised certain provisions of the False Claims Act.

16.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as

amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64

Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to $5,500 to $11,000 for

violations occurring on or after September 29, 1999.

**B**.     **The Federal Anti-Kickback Statute**

17.     The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of

congressional concern that remuneration and gifts given to those who can influence health care

decisions corrupts medical decision-making and could result in the provision of goods and

services that are medically unnecessary or even harmful to a vulnerable patient population.  To

protect the integrity of the federal health care programs, Congress enacted a prohibition against

the payment of kickbacks in any form.  The statute was enacted in 1972; Congress strengthened

it in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not

evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and

(c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No.

95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-

93.

18.     The AKS prohibits any person or entity from offering, making, or accepting

payment to induce or reward any person for referring, recommending, or arranging for the

purchase of any item for which payment may be made in whole or in part by a federal health care

program.  In pertinent part, the statute provides:

(b)  Illegal remunerations

> (1) Whoever knowingly and willfully solicits or receives
> any remuneration (including any kickback, bribe, or rebate)
> directly or indirectly, overtly or covertly, in cash or in
> kind—

5

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person–

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

19.      Under the AKS, a physician, such as Wasserman, may not solicit or receive any

remuneration, in cash or kind, directly or indirectly, in return for referring to a laboratory, such

as TPL, biopsies for which payment may be made by federal health care programs.  Likewise, a

laboratory, such as TPL, may not offer remuneration of any kind in order to induce referrals of biopsies for which payment may be made by federal health care programs.

20.     The AKS not only prohibits outright bribes, but also prohibits any remuneration by a laboratory to a physician that has, as one of its purposes, inducement of the physician to refer biopsies to the laboratory.

## V.     THE MEDICARE PROGRAM

21.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., known as the Medicare program.   Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426A.  Medicare is administered by the Center for Medicare and Medicaid Services ("CMS"), which is part of the Department of Health and Human Services.  At all times relevant to this complaint, CMS contracted with private contractors referred to as "fiscal intermediaries," "carriers," and Medicare Administrative Contractors, to act as agents in reviewing and paying claims submitted by healthcare providers.   42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100.

22.     To participate in the Medicare program, health care providers enter into contracts with HHS-CMS in which the provider agrees to conform to all applicable statutory and regulatory requirements for reimbursement from Medicare, including the provisions of Section 1862 of the Social Security Act and Title 42 of the Code of Federal Regulations.  Among the legal obligations of participating providers is the requirement not to make false statements or misrepresentations of material facts concerning payment requests.  42 C.F.R. §§ 1320a-7b(a)(1)-(2), 413.24(f)(4)(iv), 1001.101(a)(1); 42 U.S.C. §  1320a-7b(a)(1)-(2).

23.     Compliance with the AKS is a prerequisite for receiving payment form the Medicare program.  For example, to qualify as a Medicare provider, physicians must certify on a

Form CMS 855I when enrolling in Medicare that they "agree to abide by Medicare laws, regulations and program instructions that apply to [them]" and that they "understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute and the Stark Law), and on [their] compliance with all application conditions of participation in Medicare."

### A.    <u>Submitting Claims for Reimbursement</u>

24.    For outpatient treatment, all Medicare reimbursement is subject to Part B.  42 U.S.C. §§ 1395j-1395w-4.  To obtain Medicare reimbursement pursuant to Part B, providers submit claims using forms known as CMS 1500s.  Among the information the provider includes on a CMS 1500 form are certain five-digit codes, known as Common Procedural Codes, or CPT codes, that identify the services rendered and for which reimbursement is sought.

25.    Any provider seeking Medicare reimbursement through Part B must certify on a CMS Form 1500 that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision."

### B.    <u>Proper Documentation of Medical Services</u>

26.    As CMS makes clear to physicians, proper documentation of medical services provided is important both for the care of the patient as well as for the agency's ability to assess whether reimbursement is appropriate.  As stated in the 1995 Documentation Guidelines for Evaluation & Management Services ("1995 Guidelines"):

> Medical record documentation is required to record pertinent facts, findings, and observations about an individual's health history including past and present illnesses, examinations, tests, treatments, and outcomes.

8

> The medical record chronologically documents the care of the patient and
> is an important element contributing to high quality care.

27.     A proper medical record plays an important role in patient care, facilitating,

among other things:

- A physician's ability to evaluate and plan the patient's treatment and to monitor the patient's health over time; and
- Communication and continuity with other health care providers involved in the patient's care.

*See* 1995 Guidelines at 1.

28.     In addition, proper documentation is critical to CMS to allow it to perform claims

reviews, as well as reviews of appropriate utilization and quality of care.

29.     CMS provides physicians with clear guidelines as to what a proper medical record

should contain, if the doctor intends to seek reimbursement for services from a federal health

care program.  *See id.* and 1997 Documentation Guidelines for Evaluation & Management

Services ("1997 Guidelines").  Physicians who do not properly document services rendered are

not entitled to reimbursement from CMS for those services.

## VI.     DEFENDANTS' FRAUDULENT SCHEMES

### A.     <u>The Kickback Scheme</u>

#### 1.     Surgical Pathology and CPT Code 88305

30.     When a dermatologist decides that a lesion is appropriate for biopsy, he first

removes the lesion and preserves it, typically in a jar containing a preservative such as formalin.

Many dermatologists will send their specimens to an outside laboratory for the preparation of a

slide and a professional reading and diagnosis by the lab's pathologist.  In such instances, the lab

prepares a pathology report providing gross and microscopic description of the specimen and a

diagnosis, such as basal cell carcinoma or squamous cell carcinoma.  That pathology report is provided to the dermatologist for inclusion in the patient's medical file.

31.     In the scenario described above, the dermatologist would be permitted to bill Medicare CPT code 11000 for the biopsy – *i.e.*, the removal of the lesion – and the lab would be permitted to bill CPT code 88305 for the technical preparation of the slide and the professional reading of the slide.   A CPT code 88305 claim without any modifiers is sometimes referred to as the "global," as it indicates that the provider submitting the claim – in this scenario the lab – performed both the technical and professional components involved in the surgical pathology.

32.     Some dermatologists opt to use a lab to prepare the slide and elect to perform the professional reading of the slide themselves.  In these instances, the lab is permitted to bill Medicare using CPT code 88305-TC.  The TC modifier communicates to CMS that the lab only performed, and only is billing Medicare for, the technical component – *i.e.*, the slide preparation. The dermatologist who reads the slide would be allowed to bill Medicare using CPT code 88305-26.  By using the 26 modifier in this instance, the dermatologist represents to CMS that he performed the professional component – *i.e.*, the reading of the slide, the diagnosis of the specimen, and the documentation of said diagnosis for the patient's file.

### 2.     Wasserman-TPL Kickback Arrangement

33.     In or about 1997, SuarezHoyos and Wasserman reached an agreement in order to increase Wasserman's referrals of Medicare patients to TPL.

34.     According to the doctors' arrangement, Wasserman would send to TPL a biopsy specimen he had excised from a patient for testing.  TPL would prepare a slide for that tissue and a TPL pathologist would interpret the slide and prepare a pathology report with a diagnosis.  TPL would provide that report to Wasserman.  This work entitled *TPL* to bill Medicare for the global

– *i.e.*, both the technical component and the professional component for that specimen. Nonetheless, in an effort to increase the number of Medicare referrals Wasserman made to TPL, SuarezHoyos and TPL allowed *Wasserman* to bill Medicare for the professional component for that specimen – even though he did not do the work that would permit him to seek such reimbursement.

35.     At all times relevant to this Complaint, defendants were aware that their arrangement violated the AKS and that the claims they submitted to CMS pursuant to the arrangement were not entitled to reimbursement.  In fact, defendants took affirmative steps to hide the fraud from CMS.  For example, the pathology reports that were prepared for Wasserman by TPL contained a signature block for Wasserman in order to suggest that he had interpreted the slide and drafted the report.

36.     In addition, on several occasions, both TPL and Wasserman submitted to CMS pathology reports for the agency's review.  The reports TPL submitted, however, had been redacted by TPL to remove the diagnosis and Wasserman's signature block, while the reports as submitted by Wasserman contained the diagnosis and his signature block.

37.     For example, on or about September 5, 2003, Wasserman submitted a claim to CMS for services purportedly provided to patient AAA.  With the claim, he provided CMS the patient's medical records, including eight pathology reports.  Each of these reports, created by TPL, included a gross description, a microscopic description, and a microscopic diagnosis of the specimen Wasserman sent to the lab for biopsy testing.  The reports also included a signature line for Wasserman.

38.     On or about September 25, 2003, TPL submitted claims to CMS for the pathology work it provided for patient AAA – the same work for which Wasserman billed CMS.  With its

11

claim, TPL provided CMS with the pathology reports it created.  The reports are identical to the ones submitted by Wasserman, except that the ones submitted by TPL had been redacted to remove the microscopic description and microscopic diagnosis as well as Wasserman's signature line.

39.     Defendants engaged in this scheme with the express purpose of perpetuating their fraud on CMS.  By submitting the redacted and unredacted versions of the same pathology reports, TPL and Wasserman intended to mislead CMS to believe that Wasserman was performing the professional component of the surgical pathology for which he was billing the Medicare program, when, in fact, both knew that it was TPL that had performed the procedure.

40.     In furtherance of the defendants' kickback arrangement, Wasserman also sent TPL specimens taken from patients who were not Medicare beneficiaries.  On numerous occasions, TPL would perform both the technical and professional components on these specimens and would nonetheless allow Wasserman to bill the patient's private insurance the global fee – not just the professional component.  For example, on September 12, 2005, Wasserman submitted claims for the global 88305 – work TPL, not Wasserman, performed – to Blue Cross Blue Shield for the following patients: A, B, C, D, E, and F.  Wasserman received an average of more than $100 per claim from Blue Cross – for work that TPL had performed.  TPL offered Wasserman this remuneration as further inducement to Wasserman to send his Medicare-eligible referrals to TPL in violation of the AKS.

41.     The defendants' kickback scheme resulted in a substantial financial benefit to Wasserman.  Medicare reimbursed Wasserman nearly $50 on average for each specimen he claimed to have interpreted, and private insurers paid him nearly twice that for the global he billed them.

42.     Not surprisingly, the scheme also proved valuable for TPL and SuarezHoyos. Induced by this substantial financial benefit, Wasserman dramatically increased the number of biopsies he performed and the Medicare referrals he sent to TPL.  Thus, even though the scheme required TPL to forego the nearly $50 payment per specimen in professional component from Medicare and nearly $100 payment for global services from private insurers, the increase in Medicare referrals Wasserman provided as a result made the deal valuable to TPL and SuarezHoyos.

43.     From 2000-2005, pursuant to this kickback arrangement, Wasserman submitted more than 35,700 claims for CPT code 88305-PC and received more than $3.5 million in reimbursement from Medicare.  In addition, over that same time period, TPL submitted the same number of claims for 88305-TC, amounting to more than $3.9 million of reimbursement by Medicare.

44.     For example, the following claims submitted pursuant to this scheme:

| Claim | Date of Service ("DOS") |
|-------|-------------------------|
| 1     | 8/25/03                 |
| 2     | 10/4/04                 |
| 3     | 10/6/04                 |
| 4     | 11/15/04                |
| 5     | 11/15/04                |
| 6     | 11/15/04                |

45.     Because Wasserman did not perform the professional component for any of these claims, he was not entitled to reimbursement for any of the claims, thereby rendering all such

claims false claims and violative of the FCA.  In addition, because each of the aforementioned claims submitted by defendants remitted from an arrangement that violated the AKS, none of the claims submitted by either Wasserman or TPL was eligible for reimbursement.  Thus, all claims submitted as a result of the arrangement were ineligible for payment and as false claims and violated the FCA.

**B.** **Wasserman's Billing of Unnecessary Biopsies**

46.     CPT code 11100 is defined as: "Biopsy of skin, subcutaneous tissue and/or mucous membrane (including simple closure), unless otherwise listed; single lesion."  The code is used to bill the first biopsy performed on a patient during a visit.  CPT code 11101 is used to bill every additional biopsy performed on the same patient during that visit.

47.     As described above, Wasserman received a substantial kickback for every biopsy specimen he sent to TPL for diagnosis.  As a result of this financial incentive, Wasserman increased the number of biopsies he performed on his patients after he entered into the agreement by performing medically unnecessary biopsies.  In 1997, the year in which Wasserman and TPL entered into the kickback agreement, the number of biopsies Wasserman performed nearly doubled from what he had performed annually in each of the previous six years.

**C.** **Wasserman's Fraudulent Billing of E/M Services**

**1.**     **CPT Codes 99213 and 99214**

48.      Qualified providers are entitled to bill Medicare for time a physician spends with a patient for evaluation and management ("E/M") services during a patient office visit.  E/M services vary with respect to, among other factors, the time the physician spends with the patient, as well as the complexity and severity of the health-related issues addressed by the physician.

49.     To bill Medicare for E/M services provided to an existing patient, physicians must choose one of five CPT codes – 99211, 99212, 99213, 99214, and 99215.  The key components upon which the physician's billing decision should be based are: (1) the degree to which the physician explores the patient's medical history; (2) the extent of the physician's examination of the patient; and (3) the complexity of the medical decision making in which the physician must engage to address the issues presented by the patient.  *See, e.g.,* 2008 CPT Codebook and 1995 Guidelines at 3.

50.     Intraservice – or "face-to-face" – time spent with the patient is an additional factor for determining the appropriate level of coding to bill.  The times associated with each E/M level are averages representing a range of times that may be higher or lower.  Time in this context refers only time spent face-to-face with the patient and/or the patient's family.  It does not include non-face-to-face time, such as "reviewing records and tests, arranging for further services, and communicating further with other professionals and the patient through written reports and telephone contact."  *Id.*

a.      Selecting the Appropriate Level of E/M Services

51.     For an office visit to qualify as a CPT code 99213, at a minimum, the physician must have performed either an expanded problem-focused history[2] or an expanded problem-focused examination[3] as defined in the CPT codebook.  Physicians, on average, spend 15 minutes face-to-face with the patient and/or family for services they bill using CPT code 99213.

---

[2] An expanded problem-focused history includes a review of the patient's chief complaint, a brief history of present illness, and any problem pertinent to a system review.
[3] An expanded problem-focused examination includes a limited examination of the affected body area or organ system and other symptomatic or related organ system(s).

52.     For an office visit to qualify as a CPT code 99214, the physician must have performed at a minimum: a detailed patient history[4] or a detailed examination[5]. Physicians, on average, spend 25 minutes face-to-face with the patient and/or family for an office visit billed as CPT code 99214.

b.     Documentation of E/M Services

53.     While the aforementioned principles for proper documentation of all medical procedures apply equally to E/M services, CMS, in its 1995 and 1997 Guidelines, provides additional guidance to physicians about what documentation should be in a patient's file in the case of E/M services.

54.     For example, the medical record should clearly reflect the chief complaint – defined as "a concise statement describing the symptom, problem, condition, diagnosis, physician recommended return, or other factor that is the reason for the encounter." 1995 Guidelines at 5.

55.     In addition, where a physician takes a history of present illness ("HPI"), the patient's medical record should include a chronological description of the development of the patient's present illness from the first sign and/or symptom or from the previous encounter to the present.  In the case of an extended history, the patient's file should document at least four of the following elements: location, quality, severity, duration, timing, context, modifying factors, and associated signs and symptoms.

---

[4] A detailed patient history includes a review of the patient's chief complaint; an extended history of the patient's present illness and history of the patients past, family, and social history related to the complaint; and a review of both the system related to the illness and of a limited number of other additional systems.
[5] A detailed examination includes an extended examination of the affected body area(s) and other symptomatic or related organ systems(s).

### 2.      Use of a 25 Modifier

56.      Medical procedures typically involve a physician and patient conferring about the procedure and issues related to the condition giving rise to the procedure before and/or after the procedure itself.  As such, CMS has built that consultation into its reimbursement scheme for procedures and does not permit doctors to bill such consultation as E/M services unless the "patient's condition required a significant separately identifiable E/M service above and beyond other services provided or beyond the usual preservice and postservice care associated with the procedure that was performed."  Medicare Claims Processing Manual, Ch. 12, § 30.6.6(B).  In those instances, and only in those instances, a physician may bill the E/M services rendered separate from the procedure by attaching a 25 modifier to the appropriate E/M CPT code.

57.      To qualify for reimbursement from Medicare, the physician's documentation of that office visit must support the decision to attach the modifier – *i.e.*, "[b]oth the medically necessary E/M service and the procedure must be appropriately and sufficiently documented by the physician . . . in the patient's medical record to support the claim for these services[.]" *Id.*

### 3.      Wasserman's Fraudulent E/M Billing

58.      From 2000 through 2008, Wasserman billed Medicare for 37,467 patient office visits using either the 99213 or 99214 code.  These claims resulted in payments to Wasserman of more than $1.9 million.  Based on a claims review performed by the Government, Wasserman should have received *no* reimbursement from Medicare for roughly 80% of these claims.  Wasserman knew he was entitled to no reimbursement in those instances and yet filed claims seeking payment from Medicare, rendering the claims false and in violation of the FCA.

59.      Wasserman's documentation of the majority of E/M services he purports to have rendered falls far short of what CMS requires to justify reimbursement for those services.

60.    In addition, Wasserman frequently used the 25 modifier to try to extract from

Medicare additional payment for E/M services when the patient file contains no information

suggesting that he consulted with the patient about any issues beyond what would be expected in

connection with the underlying procedure.

61.    The following table includes a list of examples of false E/M claims Wasserman

submitted to Medicare:

| Patient | DOS | E/M Level Billed | E/M Level Supported by Documentation |
|---------|------|------------------|--------------------------------------|
| G | 2/8/07 | 99213-25 | None |
| H | 2/27/07 | 99214-25 | None |
| I | 8/28/06 | 99213-25 | None |
| J | 4/9/08 | 99213-25 | None |
| K | 4/30/07 | 99213-25 | None |
| L | 12/19/07 | 99214-25 | None |
| M | 6/10/08 | 99214-25 | None |
| N | 4/5/07 | 99213-25 | None |
| O | 4/15/08 | 99213-25 | None |
| P | 4/16/07 | 99214-25 | None |
| Q | 4/18/06 | 99213-25 | None |
| R | 11/21/06 | 99213-25 | None |
| S | 2/19/07 | 99213-25 | None |
| T | 10/9/06 | 99214-25 | None |

### 4.     Frequency of Claims for E/M Services

62.     The sheer number of hours Wasserman would have had to have spent in order to have performed just the E/M services for which he billed Medicare demonstrates the fraud that his billing of such claims represents.  The following days are examples of the work he claimed to have performed on Medicare patients alone:

a.     December 18, 2000

63.     On December 18, 2000, Wasserman billed Medicare and received reimbursement for 75 office visits, which, using the averages of intraservice (*i.e.*, face-to-face time with the patient) cited in the CPT manuals, total more than 26 hours.  That same day he also billed Medicare for four adjacent tissue transfers[6], at least 85 biopsies, at least 70 destructions, three complex repairs, and two excisions.

b.     June 10 2002

64.     On June 10, 2002, Wasserman billed Medicare and received reimbursement for 54 office visits totaling more than 17 hours of face-to-face time with his patients according to CPT averages.  That same day he also billed Medicare for six adjacent tissue transfers, at least 75 biopsies, at least 60 destructions, two skin grafts, and a complex repair.

c.     August 12, 2002

65.     On August 12, 2002, Wasserman billed Medicare and received reimbursement for 63 office visits totaling more than 20 hours of face-to-face time with his patients according to CPT averages.  That same day he also billed Medicare for at least 85 biopsies, at least 50 destructions, and two adjacent tissue transfers.

---

[6] As discussed below, an adjacent tissue transfer is a complicated and time-consuming procedure.  Estimates for the amount of time a physician spends in surgery performing such a procedure are around two hours per procedure.

       d.     October 28, 2002

66.     On October 28, 2002, Wasserman billed Medicare and received reimbursement for 54 office visits totaling more than 19 hours of face-to-face time with his patients according to CPT averages.  That same day he also billed Medicare for at least 70 biopsies, at least 48 destructions, four complex repairs, nine adjacent tissue transfers, and a skin graft.

       e.     May 28, 2003

67.     On May 28, 2003, Wasserman billed Medicare and received reimbursement for 71 office visits totaling more than 22 hours of face-to-face time with his patients according to CPT averages.  That same day he also billed Medicare for more than 100 biopsies, at least 65 destructions, four complex repairs, two adjacent tissue transfers, and reading 53 slide specimens.

       f.     September 17, 2003

68.     On September 17, 2003, Wasserman billed Medicare and received reimbursement for 69 office visits totaling more than 20 hours of face-to-face time with his patients according to CPT averages.  That same day he also billed Medicare for more than 100 biopsies, at least 48 destructions, four complex repairs, four adjacent tissue transfers, two excisions, and reading 57 slide specimens.

       g.     October 27, 2003

69.     On October 27, 2003, Wasserman billed Medicare and received reimbursement for 54 office visits totaling more than 18 hours of face-to-face time with his patients according to CPT averages.  That same day he also billed Medicare for 13 adjacent tissue transfers, more than 60 biopsies, at least 26 destructions, three complex repairs, two excisions, and reading 49 slide specimens.

        h.     <u>March 9, 2004</u>

70.     On March 9, 2004, Wasserman billed Medicare and received reimbursement for 58 office visits totaling more than 22 hours of face-to-face time with his patients according to CPT averages.  That same day he also billed Medicare for 12 adjacent tissue transfers, more than 40 biopsies, at least 20 destructions, six complex repairs, and reading 41 slide specimens.

        h.     <u>May 5, 2004</u>

71.     On May 5, 2004, Wasserman billed Medicare and received reimbursement for 55 office visits totaling more than 19 hours of face-to-face time with his patients according to CPT averages.  That same day he also billed Medicare for 15 adjacent tissue transfers, more than 60 biopsies, at least 70 destructions, three complex repairs, three skin grafts, and reading 58 slide specimens.

        i.     <u>November 2, 2004</u>

72.     On November 2, 2004, Wasserman billed Medicare and received reimbursement for 77 office visits totaling more than 25 hours of face-to-face time with his patients according to CPT averages.  That same day he also billed Medicare for more than 400 destructions, four adjacent tissue transfers, more than 100 biopsies, two complex repairs, and reading 58 slide specimens.

        j.     <u>April 25, 2005</u>

73.     On April 25, 2005, Wasserman billed Medicare and received reimbursement for 56 office visits totaling more than 21 hours of face-to-face time with his patients according to CPT averages.  That same day he also billed Medicare for seven adjacent tissue transfers, more than 50 biopsies, at least 215 destructions, three complex repairs, and reading 44 slide specimens.

k.    June 6, 2005

74.    On June 6, 2005, Wasserman billed Medicare and received reimbursement for 50 office visits totaling more than 23 hours of face-to-face time with his patients according to CPT averages.  That same day he also billed Medicare for nine adjacent tissue transfers, more than 55 biopsies, at least 250 destructions, a complex repair, and reading 45 slide specimens.

l.    October 28, 2005

75.    On October 28, 2005, Wasserman billed Medicare and received reimbursement for 66 office visits totaling more than 24 hours of face-to-face time with his patients according to CPT averages.  That same day he also billed Medicare for five adjacent tissue transfers, more than 70 biopsies, at least 340 destructions, a complex repair, a skin graft, and reading 46 slide specimens.

76.    Wasserman's employees and office records confirm that his practice was only open for roughly 12 hours a day, from 7:00 AM to 7:00 PM.

**D.    Wasserman's Fraudulent Billing of Adjacent Tissue Transfers**

**1.    CPT Codes 14021 and 14041**

a.    Adjacent Tissue Transfers

77.    When a dermatologist excises a lesion, the process creates a defect, essentially an opening, in the patient's skin.  Depending upon, among other factors, the size and location of the defect, the dermatologist may decide that the most appropriate way to close the defect is a complicated and time-consuming procedure called an adjacent tissue transfer.  In essence, an adjacent tissue transfer involves freeing skin from underlying tissue next to the defect and transferring or transplanting that skin to the defect.  The flaps of healthy skin remain connected

22

at one or more of their borders and are moved to the defect and attached in their entirety to their new location.

     b.  <u>Billing Adjacent Tissue Transfers to Medicare</u>

  78.  CMS assigns different CPT codes to adjacent tissue transfers based on the location of the transfer on the patient's body and the size of the defect being repaired.  At all times relevant to this Complaint, CPT codes 14020 and 14021 have represented an adjacent tissue transfer performed on one of the following locations on the body: the scalp, arms, and/or legs.  The difference between a 14020 and a 14021 procedure is the size of the defect.[7]  A 14020 procedure is defined as a transfer with a defect of less than 10.1cm² (about 1.56 in²), while a 14021 procedure is defined as a transfer with a defect of between 10.1cm² and 30.0 cm² (about 4.65 in²).

  79.  At all times relevant to this Complaint, CPT codes 14040 and 14041 have represented an adjacent tissue transfer performed on one of the following locations on the body: the forehead, cheeks, mouth, neck, axillae, genitalia, hands, and/or feet.  As with the 14020/14021 codes, the difference between a 14040 and a 14041 transfer is the size of the defect being repaired.  A 14040 procedure is defined as a transfer to repair a defect of less than 10.1cm², while a 14041 procedure is defined as a transfer to repair a defect of between 10.1cm² and 30.0 cm².

  80.  Accordingly, when a physician submits a CMS 1500 form that includes a claim for either a 14041 or 14021 procedure, the physician is representing to CMS that he or she has performed an adjacent tissue transfer with a defect that is *at least* 10.1cm².  CMS guidelines

---

[7] For purposes of determining the appropriate CPT code, the term "defect" refers to the primary defect resulting from the excision and the secondary defect resulting from flap design to perform construction.  The area of the primary and secondary defects is measured by multiplying each defect's respective length and width.  The "defect" size for purposes of the CPT code is the sum of the primary and secondary defects.

advise physicians that they must maintain proper documentation to support that claim – *i.e.*, the documentation, typically the patient file, should demonstrate that the physician was justified in performing an adjacent tissue transfer and that the defect measured at least 10.1cm².[8]

      c.    Physician Time Spent on an Adjacent Tissue Transfer

81.    An adjacent tissue transfer requires an extensive amount of physician time in performing the surgery, as well as in pre- and post-operative activities.  According to the AMA/Specialty Society RVS Update Committee ("RUC")[9], in a procedure billed as a CPT code 14021 on average a physician will spend one hour and 46 minutes in intraservice time and an additional two hours in pre- and post-operative work[10].

      **2.**    **Wasserman's Upcoding of Adjacent Tissue Transfers**

82.    Since at least 2000, Wasserman engaged in a scheme where he would submit claims to Medicare for either a 14041 or a 14021 procedure, knowing that *at most* he had performed a 14040 or a 14020 procedure.  As a result of these knowing misrepresentations to the Medicare program, Wasserman received on average roughly $150 more per claim than he would have had he billed for a 14040 or 14020 procedure.   As such, these were false and violated the FCA.

83.    The following table includes a list of examples, identified through a Government record review, of false claims Wasserman submitted pursuant to this "upcoding" scheme.  In

---

[8] For example, the 1995 Guidelines state that "CPT and ICD-9-CM codes reported on the health insurance claim form or billing statement should be supported by the documentation in the medical record."

[9] Since 1992, CMS has based payments to physicians on a standardized physician payment schedule based on a resource-based relative value scale ("RBRVS").  A significant factor in the RBRVS is the physician work involved in rendering the relevant services.  The time a physician spends in providing said services contributes to the calculation of physician work.  RUC was formed in 1991 in order to make recommendations to CMS concerning the appropriate RBRVS for medical services.  In fulfillment of this role, RUC provides time estimates to CMS for various medical services, including the surgical procedures at issue in this Complaint.  CMS relies on these estimates in determining the amount of reimbursement it will pay for the various procedures.

[10] RUC averages for 2010 for 14041 procedures are 135 minutes of intraservice time and an additional 168 minutes in pre- and post-operative work.

each instance identified below, the documentation fails to support his claim that the defect

measured at least 10.1cm².

| Patient | DOS | CPT Code Billed | CPT Code Allowed[11] |
|---------|-----|-----------------|-------------------|
| U | 11/13/07 | 14041-79 | 14040 |
| V | 2/26/07 | 14021 | 14020 |
| W | 1/8/08 | 14021-79 | 14020 |
| X | 8/16/08 | 14021 | 14020 |
| Y | 1/9/06 | 14021 | 14020 |
| Z | 8/29/06 | 14041-79 | 14040 |
| AA | 5/7/07 | 14021 | 14020 |
| AB | 10/11/07 | 14041-79 | 14040 |
| AC | 5/8/06 | 14021 | 14020 |
| AD | 4/29/08 | 14021-79 | 14020 |
| AE | 9/25/07 | 14041 | 14040 |
| AF | 9/26/06 | 14041-79 | 14040 |
| AG | 6/21/06 | 14021-79 | 14020 |
| AH | 3/15/06 | 14041-79 | 14040 |

84.     Wasserman's upcoding scheme has resulted in additional Medicare payments to

him of millions of dollars.   For example, between 2000 and 2008, Wasserman submitted claims

for 6,543 such procedures, for which he received $4,186,341 in Medicare reimbursement.

---

[11] The Government does not concede that Wasserman was entitled to bill the CPT codes identified in this column. To the contrary, as discussed below, in many instances Wasserman was not entitled to bill for any form of adjacent tissue transfer. The "CPT Code Allowed" column in this table is merely illustrative of the highest level of adjacent tissue transfer that the patient file could support.

### 3.    Frequency of Claims for Adjacent Tissue Transfers

85.    The frequency at which Wasserman claimed to have performed adjacent tissue transfers from at least as early as 2000 is illustrative of his fraudulent billing scheme.  In the six years between 2000 and 2005, for example, there were more than 130 days on which Wasserman billed Medicare for at least 11 such procedures.  On each of those days, he billed numerous additional, time-consuming procedures as well.  Not surprisingly, a review of claims he submitted between October 2004 and June 2005 indicates that he billed Medicare for these claims at least *36 times* more often than his peers.

86.    The sheer number of hours Wasserman would have had to have spent in order to have performed just the adjacent tissue transfers for which he billed Medicare illustrates the fraud underlying his billing scheme – *i.e.*, billing Medicare for services he did not perform and/or services that were not medically necessary.

87.    The following days are examples of the work Wasserman claimed to have performed on Medicare patients alone[12]:

a.    March 25, 2000

88.    On March 25, 2000, Wasserman billed Medicare and received reimbursement for 46 adjacent tissue transfers totaling more than 90 hours of surgical time according to RUC estimates.  That same day he also billed Medicare for reading 29 specimen slides, a 25-minute patient office visit, at least 13 biopsies, two complex repairs, and an excision.

b.    September 1, 2000

89.    On September 1, 2000, Wasserman billed Medicare and received reimbursement for 28 adjacent tissue transfers totaling more than 50 hours of surgical time according to RUC

---

[12] These do not include the numerous services that Wasserman billed to private insurance plans for patients who were not Medicare beneficiaries.

estimates.  That same day he also billed Medicare for reading 24 specimen slides, 8 patient office visits of around 25-minutes each, at least ten biopsies, nine excisions, and ten complex repairs.

   c. <u>February 2, 2001</u>

  90. On February 2, 2001, Wasserman billed Medicare and received reimbursement for 17 adjacent tissue transfers totaling more than 30 hours of surgical time according to RUC estimates.  That same day he also billed Medicare for ten patient office visits of roughly 25 minutes each, reading 31 specimen slides, at least 17 biopsies, 12 excisions, 12 complex repairs, at least eight destructions,[13] and two skin grafts.

   d. <u>June 26, 2001</u>

  91. On June 26, 2001, Wasserman billed Medicare and received reimbursement for 16 adjacent tissue transfers totaling more than 30 hours of surgical time according to RUC estimates.  That same day he also billed Medicare for 41 patient office visits, reading 44 specimen slides, at least 60 biopsies, and more than 28 destructions.

   e. <u>January 24, 2002</u>

  92. On January 24, 2002, Wasserman billed Medicare and received reimbursement for 15 adjacent tissue transfers totaling more than 30 hours of surgical time according to RUC estimates.  That same day he also billed Medicare for 28 patient office visits, reading 33 specimen slides, at least 39 biopsies, a skin graft, at least 27 destructions, thee excisions, and three complex repairs.

---

[13] CPT code 17003 is defined as destruction of between two and 14 lesions on a patient in a single visit and CPT code 17004 is defined as destruction of 15 or more lesions on a patient in a single visit.  From 2000-2008, Wasserman submitted 13,493 claims for CPT code 17003 and 6,312 claims for CPT code 17004, meaning that he claimed to have performed more than 100,000 destructions over that time period.

    f.  September 17, 2002

93.  On September 17, 2002, Wasserman billed Medicare and received reimbursement for 18 adjacent tissue transfers totaling more than 35 hours of surgical time according to RUC estimates.  That same day he also billed Medicare for 51 patient office visits, reading 46 specimen slides, at least 75 biopsies, a skin graft, at least 50 destructions, and six complex repairs.

    g.  September 24, 2003

94.  On September 24, 2003, Wasserman billed Medicare and received reimbursement for 31 adjacent tissue transfers totaling more than 60 hours of surgical time according to RUC estimates.  That same day he also billed Medicare for ten patient office visits, reading 47 specimen slides, at least 13 biopsies, two skin grafts, ten excisions, at least six destructions, and ten complex repairs.

    h.  October 14, 2003

95.  On October 14, 2003, Wasserman billed Medicare and received reimbursement for 19 adjacent tissue transfers totaling nearly 40 hours of surgical time according to RUC estimates.  That same day he also billed Medicare for 55 patient office visits, reading 64 specimen slides, at least 74 biopsies, six complex repairs, five excisions, and at least 44 destructions.

    i.  April 13, 2004

96.  On April 13, 2004, Wasserman billed Medicare and received reimbursement for 17 adjacent tissue transfers totaling more than 30 hours of surgical time according to RUC estimates.  That same day he also billed Medicare for 49 patient office visits, reading 54

specimen slides, at least 55 biopsies, six complex repairs, six excisions, and at least 60 destructions.

          j.      <u>April 14, 2004</u>

97.      On April 14, 2004, Wasserman billed Medicare and received reimbursement for 17 adjacent tissue transfers totaling more than 30 hours of surgical time according to RUC estimates.  That same day he also billed Medicare for 33 patient office visits, reading 48 specimen slides, at least 50 biopsies, four complex repairs, three excisions, and at least 40 destructions.

          k.      <u>January 18, 2005</u>

98.      On January 18, 2005, Wasserman billed Medicare and received reimbursement for 19 adjacent tissue transfers totaling nearly 40 hours of surgical time according to RUC estimates.  That same day he also billed Medicare for 24 patient office visits, reading 55 specimen slides, at least 60 biopsies, five complex repairs, five excisions, two skin grafts, and at least 287 destructions.

          l.      <u>March 30, 2005</u>

99.      On March 30, 2005, Wasserman billed Medicare and received reimbursement for 21 adjacent tissue transfers totaling more 40 hours of surgical time according to RUC estimates. That same day he also billed Medicare for 30 patient office visits, reading 61 specimen slides, at least 70 biopsies, six complex repairs, seven excisions, and at least 290 destructions.

100.      The facts material to the right of action for the claims asserted against Wasserman concerning the billing of services that were not rendered or services that were not medically necessary became known by the official of the United States charged with responsibility to act in

the circumstances no earlier than 2008.  In asserting these claims, the United States avails itself

of the ten-year statute of limitations set forth in the FCA. 31 U.S.C. § 3731(b).

### FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

101.    The United States repeats and realleges the preceding paragraphs as if fully set

forth herein.

102.    Defendants Wasserman and SuarezHoyos knowingly presented and caused to be

presented false or fraudulent claims for payment or approval to the United States by submitting

claims for surgical pathology that were ineligible for payment as a result of illegal kickbacks.

103.    Wasserman knowingly presented and/or caused to be presented false or fraudulent

claims for payment or approval to the United States by submitting claims for E/M services that

were ineligible for payment.

104.    Wasserman knowingly presented false or fraudulent claims for payment or

approval to the United States by submitting claims for biopsies that were ineligible for payment.

105.    Wasserman knowingly presented false or fraudulent claims for payment or

approval to the United States by submitting claims for adjacent tissue transfers that were

ineligible for payment.

106.    By virtue of the false or fraudulent claims that defendants made and/or caused to

be made, the United States suffered damages and therefore is entitled to treble damages under the

False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to

$11,000 for each violation.

**SECOND CAUSE OF ACTION**

(False Claims Act: Presentation of False Statements to Get False Claims Paid)
(31 U.S.C. § 3729(a)(2))

107.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

108.    Defendants Wasserman and SuarezHoyos knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid by the United States for surgical pathology that were ineligible for payment as a result of illegal kickbacks.

109.    Wasserman knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid by the United States for E/M services that were ineligible for payment.

110.    Wasserman knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid by the United States for biopsies that were ineligible for payment.

111.    Wasserman knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid by the United States for adjacent tissue transfers that were ineligible for payment.

112.    By virtue of the false or fraudulent claims that defendants made and/or caused to be made, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## THIRD CAUSE OF ACTION

(False Claims Act: Conspiracy to Defraud the United States)
(31 U.S.C. § 3729(a)(3))

113.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

114.    Defendants Wasserman and SuarezHoyos knowingly conspired to defraud the United States by getting false or fraudulent claims allowed or paid pursuant to defendants' illegal kickback scheme.

115.    By virtue of the false or fraudulent claims that defendants made and/or caused to be made, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## FOURTH CAUSE OF ACTION
(Unjust Enrichment)

116.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

117.    The United States claims the recovery of all monies by which defendants have been unjustly enriched.

118.    As a consequence of the acts set forth above, defendants were unjustly enriched at the expense of the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

## FIFTH CAUSE OF ACTION
(Payment by Mistake)

119.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

120.    The United States claims the recovery of all monies by which defendants have been paid by mistake.

121.    As a consequence of the acts set forth above, defendants were paid by mistake at the expense of the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

## SIXTH CAUSE OF ACTION
(Overpayment)

122.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

123.    The United States claims the recovery of all monies by which defendants have been overpaid.

124.    As a consequence of the acts set forth above, defendants were overpaid at the expense of the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

**PRAYER FOR RELIEF**

WHEREFORE, the United States demands and prays that judgment be entered in its favor against defendants as follows:

I.　　On the First Count under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

II.　　On the Second Count under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

III.　　On the Third Count under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

IV.　　On the Fourth Count for unjust enrichment, for the damages sustained and/or amounts by which defendants were unjustly enriched or by which defendants retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

V.　　On the Fifth Count for payment by mistake, for the damages sustained and/or amounts by which defendants were paid by mistake or by which defendants retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

VI.　　On the Sixth Count for overpayment, for the damages sustained and/or amounts by which defendants were overpaid or by which defendants retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

34

## **DEMAND FOR JURY TRIAL**

The United States demands a jury trial in this case.

Respectfully submitted,

TONY WEST
ASSISTANT ATTORNEY GENERAL

ROBERT E. O'NEILL
UNITED STATES ATTORNEY

Dated:  May 9, 2011                                    By: /s/ Jeffrey S. Gleason
                                                       LACY R. HARWELL, JR.
                                                       Assistant United States Attorney
                                                       400 N Tampa St, Suite 3200
                                                       Tampa, FL 33602
                                                       (813) 274-6000
                                                       Email: randy.harwell@usdoj.gov


                                                       JOYCE R. BRANDA
                                                       PATRICIA R. DAVIS
                                                       JEFFREY S. GLEASON
                                                       Attorneys, Civil Division
                                                       United States Department of Justice
                                                       P.O. Box 261, Ben Franklin Station
                                                       Washington, D.C. 20044
                                                       (202) 305-2068
                                                       Email: jeffrey.s.gleason@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2011, I caused a true and accurate copy of the foregoing to be filed using the Court's CM/ECF system, which will send an electronic notice of filing to all counsel of record.


<u>/s/ Jeffrey S. Gleason</u>
JEFFREY S. GLEASON
Trial Attorney, Civil Division
United States Dept. of Justice