UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA
*ex rel.* ALAN M. FREEDMAN, MD,

      Plaintiffs,

v.                                                                      Case No.  8:04-cv-933-T-24 EAJ

JOSE SUAREZ-HOYOS, MD, ET AL.,

      Defendants.
_____/

**ORDER**

This cause comes before the Court on two motions: (1) the Government's Motion for Summary Judgment (Doc. No. 120), which Defendants Steven Jay Wasserman, M.D., Steven Jay Wasserman PA, and Dermatology Institute of Venice (collectively referred to as "Wasserman") oppose (Doc. No. 135); and (2) Wasserman's Motion for Summary Judgment (Doc. No. 122), which the Government opposes (Doc. No. 133). Genuine issues of material fact exist that prevents the Court from entering summary judgment on most of the issues raised in the motions. However, to the extent discussed below, there are some legal issues that the Court can resolve.

**I.  Background**

The following background is disputed: The Government contends that Dr. Steven Jay Wasserman, a dermatologist, and the Wasserman entities were involved in a kickback scheme with Independent Clinical Laboratory doing business as Tampa Pathology Laboratory ("TPL") and TPL's owner, Jose SuarezHoyos, M.D. ("Suarez"). The alleged scheme began in 1997 and consisted of Wasserman sending biopsy specimens to TPL, where TPL's pathologists would prepare the slides, review the slides, and prepare a report for Wasserman. In return for

Wasserman sending the biopsy specimens to TPL, TPL would allow Wasserman to bill Medicare for the professional component (reviewing the slides and preparing the reports) and TPL would only bill Medicare for the technical component (preparing the slides).[1]

The Government contends that Wasserman did not perform the professional component for any of the claims submitted to Medicare, and as such, he was not entitled to reimbursement for any of those claims, making all of the claims false and violative of the False Claims Act ("FCA"). In addition, the Government contends that the technical and professional component claims submitted by Wasserman and TPL resulted from an arrangement that violated the Anti-Kickback Statute ("AKS"), and as such, those claims are deemed to be false and were not eligible for reimbursement.

As a result of the kickback arrangement, the Government contends that Wasserman increased the number of biopsies he performed on his patients by performing medically unnecessary biopsies. Additionally, the Government contends that from 2000 through 2005, Wasserman up-coded the billing for the time he spent with patients for evaluation and management ("E/M") services, and for some of those claims, Wasserman may not have even performed any E/M services. The Government also contends that since 2000, Wasserman up-coded the billing for adjacent tissue transfers, that he performed medically unnecessary adjacent tissue transfers, and that he may not have even performed some of the adjacent tissue transfers

---

[1]Additionally, the Government contends that in furtherance of their kickback arrangement, Wasserman also sent TPL specimens taken from patients who were not Medicare beneficiaries. On numerous occasions, TPL would perform both the technical and professional components on these specimens at a very low cost and would allow Wasserman to bill the patient's private insurance for both components. The Government contends that TPL offered Wasserman this remuneration as further inducement to Wasserman to send his Medicare eligible biopsies to TPL.

for which he billed.

As a result of this conduct, the Government filed an amended complaint and asserts six counts against Wasserman: (1) presentation of false claims regarding the pathology work, biopsies, E/M services, and adjacent tissue transfers, in violation of 31 U.S.C. § 3729(a)(1)(A); (2) presentation of false statements and records relating to the claims for pathology work, biopsies, E/M services, and adjacent tissue transfers, in violation of 31 U.S.C. § 3729(a)(1)(B)[2]; (3) conspiracy to defraud the United States, in violation of 31 U.S.C. § 3729(a)(1)(C)[3]; (4) unjust enrichment; (5) payment by mistake; and (6) overpayment.[4] (Doc. No. 100). In response, the Wasserman entities filed an answer and thirty-two affirmative defenses. (Doc. No. 103, 105). Dr. Wasserman declined to answer the amended complaint and instead chose to exercise his rights under the Fifth Amendment. (Doc. No. 104).

## II.  Government's Motion for Summary Judgment

The Government moves for summary judgment as to Count I to the extent that the Government asserts that Wasserman submitted claims to Medicare that are false as a matter of law, because such claims were tainted by the kickback arrangement.[5] Additionally, the Government moves for summary judgment on the Wasserman entities' thirty-two affirmative

---

[2]The amended complaint cites to the former version of 31 U.S.C. § 3729 when it cites to 31 U.S.C. § 3729(a)(2).

[3]The amended complaint cites to the former version of 31 U.S.C. § 3729 when it cites to 31 U.S.C. § 3729(a)(3).

[4]The Government also asserted these claims against TPL and Suarez. However, the Government subsequently settled its claims against TPL and Suarez. (Doc. No. 111).

[5]The Government does not seek summary judgment as to Count I to the extent that it alleges that Wasserman up-coded his billings, billed for services that he did not perform, and billed for services that were not medically necessary.

defenses. Accordingly, the Court will evaluate both bases for summary judgment.

### A. Count I - Kickback Arrangement

The Government moves for summary judgment to the extent that the Government asserts that Wasserman submitted claims to Medicare that were false as a matter of law, because such claims were tainted by the kickback arrangement. Whether a kickback arrangement did, in fact, exist is a disputed factual issue in this case, and as such, summary judgment is not warranted. However, there is one sub-issue related to this count that the Court can address—the calculation of damages in this case if the Government proves that a kickback arrangement existed and that Medicare paid claims that Wasserman submitted that were related to the kickback arrangement.

Pursuant to 31 U.S.C. § 3729(a)(1), if the Government proves that Wasserman submitted a false claim to Medicare, then Wasserman would be liable to the Government "for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains." The Government argues that its damages are equal to the full amount that Medicare paid on the false claims that were tainted by the kickback arrangement, because those claims were not eligible for payment. Stated differently, the Government contends that compliance with the AKS is a precondition to payment by Medicare, and as such, Medicare should not have paid anything on claims that were related to the kickback arrangement.

Wasserman, on the other hand, argues that the Government did not suffer any damages as a result of the alleged kickback arrangement, because there is no dispute that the services that were billed and paid for were, in fact, performed. Instead, Wasserman argues that the only questions relating to those claims are: (1) who performed the services, and (2) whether the

services were related to the alleged kickback arrangement. Further, Wasserman argues that regardless of how those two questions are answered, the value of those services equaled the amount billed, and therefore, the Government did not suffer any damages as a result of paying those claims.

In support of the argument that the Government did not suffer any damages, Wasserman cites to United States v. Killough, 848 F.2d 1523 (11th Cir. 1988). In Killough, the government brought a civil action against the defendants under the False Claims Act to recover damages incurred as a result of a kickback scheme relating to the setting up of mobile homes as part of a temporary housing program after Hurricane Frederic. See id. at 1525. The scheme involved two state officials soliciting kickbacks from contractors in exchange for awarding them contracts to set up the mobile homes. See id. The contractors would inflate the invoices for the mobile home set-ups to account for the kickbacks that they paid, and the invoices were paid with federal funds from FEMA. See id.

The district court granted summary judgment in favor of the government on the issue of liability under the FCA, and a jury decided the issue of damages. See id. at 1526. Thereafter, the government appealed the district court's decision to submit the issue of damages to the jury. See id. at 1531. The government argued that the district court should have determined as a matter of law that the government's damages equaled the amount of the kickbacks. See id. at 1531-32.

In addressing the calculation of damages, the appellate court stated:

> Under the [False Claims] Act, there is no set formula for determining the government's actual damages. No single rule can be, or should be, stated for the determination of damages under the Act . . . Fraudulent interference with the government's activities damages the

5

> government in numerous ways that vary from case to case. . . . [C]ourts should remain free to fashion measures of damages on a case by case basis. . . . [C]ourts should be guided only by the principles that the United States' damages should be liberally measured to effectuate the remedial purposes of the Act, and that the United States should be afforded a full and complete recovery of all its damages.
>
> Case law indicates the measure of damages is generally determined to be the difference between what the government actually paid on the fraudulent claim and what it would have paid had there been fair, open and competitive bidding. The trier of fact must deduce from all the evidence presented what the fair market value was of the goods or services provided in order to calculate the actual damage the government suffered.

Id. at 1532 (internal quotation marks and citations omitted). As a result, the appellate court affirmed the jury's decision regarding the amount of the government's damages. See id.

Based on Killough, Wasserman argues that the proper measure of damages in this case is determined by the difference between what the Government paid on the claims and the fair market value of the services provided in relation to those claims. The Government responds that Killough is not controlling on the facts of this case, because, unlike in Killough, a precondition to payment in the instant case is compliance with the AKS. Therefore, the Government argues that this Court should follow the Seventh Circuit and conclude that, to the extent that the Government would not have paid the claims had it known the truth about the kickback arrangement, the Government is damaged in the full amount that it paid on the false claims. See U.S. v. Rogan, 517 F.3d 449 (7th Cir. 2008).

In Rogan, the government brought a civil action against the defendant for conspiring to defraud the government by submitting claims to Medicare, but concealing the fact that many of the patients received medical services as a result of referrals that violated the Stark Amendment to the Medicare Act and the AKS. See id. at 451-52. In determining the proper measure of

6

damages, the court stated:

> [It is not] important that most of the patients for which claims were submitted received some medical care–perhaps all the care reflected in the claim forms. . . . Edgewater [the medical center] did not furnish any medical service to the United States. The government offers a subsidy (from the patients' perspective, a form of insurance), with conditions. When the conditions are not satisfied, nothing is due. Thus the entire amount that Edgewater received on these 1,812 claims must be paid back. Now it may be that, if the patients had gone elsewhere, the United States would have paid for their care. . . . But [that] possibility [does not] allow[] [the defendant] to keep money obtained from the Treasury by false pretenses, or avoid the penalty for deceit.

Id. at 453. Based on Rogan, the Government urges this Court to conclude that because Medicare would not have paid claims tainted by a kickback arrangement if Medicare knew of the kickback arrangement, the damage to Medicare is the entire amount that it paid on such tainted claims.

The case law on the issue of damages for an FCA violation based on claims tainted by a kickback arrangement submitted to Medicare is sparse, and Rogan is the case that is most on point. There are FCA cases outside of the Medicare context, and which do not involve violations of the AKS, that hold that the amount of the government's damages equals the full amount that it paid out due to the false claims.[6] See U.S. v. Aerodex, Inc., 469 F.2d 1003, 1011 (5th Cir.

---

[6]The Court acknowledges that there are also FCA cases outside of the Medicare context, and which do not involve violations of the AKS, that hold that the amount of the government's damages is the difference between what the government paid on the claims and the fair market value of the goods or services provided in relation to those claims. See, e.g., Ab-Tech Construction, Inc. v. U.S., 31 Fed. Cl. 429, 434 (Ct. Fed. Cl. 1994)(stating that the government's damages for false claims relating to the construction of an automated data processing facility were zero, because the government received exactly what it paid for, despite the false statements that were made); U.S. ex rel Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 923 (4th Cir. 2003)(concluding that the government did not incur any damages from an FCA violation based on a contractor's false statements regarding its conflict of interest, because the value of the work performed equaled the amount that the government paid).

1973)(stating that damages under the former version of the FCA "must be measured by the amount wrongfully paid to satisfy the false claim"); U.S. v. TDC Mgmt. Corp., Inc., 288 F.3d 421, 428 (D.C. Cir. 2002)(stating that the district court did not err in using a but-for measure of damages, based on what the government would have paid out had it known the truth); U.S. ex rel. Liotine v. CDW Government, Inc., 2012 WL 2807040, at *11 (S.D. Ill. July 10, 2012)(stating that because compliance with the Trade Agreements Act ("TAA") was a precondition for the defendant's sales to the government, if the defendant sold products to the government in violation of the TAA, the correct measure of damages would be the entire amount that the government paid for the products); U.S. ex rel. Longhi v. U.S., 575 F.3d 458, 473 (5th Cir. 2009)(stating that the amount of the government's damages relating to research grants it provided was the total amount of the grants). The Court is persuaded by the Government's argument that the amount of the Government's damages resulting from the payment of false claims tainted by a kickback arrangement equals the full amount that Medicare paid on such claims.[7]

---

[7] This conclusion is based on the assumption that the Government can also prove that had it been aware of the kickback arrangement, it would not have paid the tainted claims. The Government alleged in the amended complaint that in order to participate in the Medicare program, Wasserman agreed to comply with all applicable statutory and regulatory requirements for reimbursement from Medicare, including compliance with the AKS. (Doc. No. 100, ¶ 22-23). As such, the Government contends that as a precondition to payment, billings must not be tainted by a kickback arrangement. See McNutt ex rel. U.S. v. Haleyville Medical Supplies, Inc., 423 F.3d 1256, 1259 (11th Cir. 2005)(finding that the plaintiff stated an FCA claim based on a violation of the AKS, because the plaintiff alleged that the defendants agreed to comply with all applicable statutory and regulatory requirements for reimbursement from Medicare, and the parties agreed that compliance with the AKS was a precondition to payment by Medicare). The Government has not submitted to the Court documentation of Wasserman's agreement to comply with all applicable statutory and regulatory requirements for reimbursement from Medicare, and it is unclear whether Wasserman disputes this contention.

The Court notes that Wasserman also relies on two criminal sentencing cases to support the argument that the Government's damages are zero. Wasserman's reliance on these cases is misplaced.

Wasserman relies on United States v. Liss, 265 F.3d 1220, 1232 (11th Cir. 2001), in which the court concluded that Medicare did not suffer a loss as a result of the defendants' kickback arrangement. However, the defendants were charged with conspiracy to defraud the government and violating the AKS; the defendants were not charged with fraudulent billing. See id. at 1225, 1232.

Wasserman also relies on United States v. Medina, 485 F.3d 1291 (11th Cir. 2007). This case, however, supports the Government's position. The Medina court determined that the amount of Medicare's loss equaled the amount that it paid on claims that were tainted by kickbacks after the defendant had certified to Medicare that she would comply with Medicare's rules and regulations, which included a prohibition against kickbacks. See id. at 1304. The Medina court noted that it did not matter that it appeared that the services related to those claims were medically necessary. See id. Thus, Medina supports the Government's argument that the amount of its damages resulting from the payment of false claims tainted by a kickback arrangement equals the full amount that Medicare paid on such claims. See also U.S. v. Webb, 386 Fed. Appx. 914, 917 (11th Cir. 2010)(rejecting the defendant's argument that the loss calculation for conspiracy to commit health care fraud should take into account the value of the services provided to patients).

Accordingly, as explained above, the Court rejects Wasserman's argument that the Government's damages are zero due to the value of the services performed. Instead, the Court

concludes that, assuming the Government proves that it paid claims that were tainted by a kickback arrangement and that it would not have paid such claims had it known the truth, the amount of the Government's damages resulting from the payment of such claims equals the full amount that Medicare paid.

### B. Affirmative Defenses

The Government also moves for summary judgment on all thirty-two of the Wasserman entities' affirmative defenses. The Wasserman entities only responded as to five of their affirmative defenses. As such, the Court deems the Government's motion for summary judgment as to the remaining twenty-seven affirmative defenses to be unopposed, and the Court will only address the five affirmative defenses that the Wasserman entities addressed.

#### 1. Affirmative Defense #11: Damages

In their Eleventh Affirmative Defense, the Wasserman entities assert that the Government suffered no damages when it paid the claims alleged to have been tainted by the kickback arrangement. The Court has already addressed the calculation of damages, as set forth above. The amount of damages, if any, that the Government has sustained, remains to be proven. However, if the Government proves: (1) that a kickback arrangement existed, (2) that Medicare paid claims that were tainted by the kickback arrangement, and (3) had Medicare been aware of the kickback arrangement, it would not have paid the tainted claims, then this affirmative defense would fail as a matter of law as to such claims.

#### 2. Affirmative Defenses #5, 6, 7: Equitable Estoppel

In their Fifth, Sixth, and Seventh Affirmative Defenses, the Wasserman entities assert that the Government's claims for relief as to the claims submitted to Medicare for the

professional component (i.e., reading the slides and preparing a report), E/M services, and adjacent tissue transfers are barred by equitable estoppel, because Wasserman relied on Medicare's payments of the submitted claims. The Government argues that it is entitled to summary judgment on these affirmative defenses, because equitable estoppel against the Government is not available under the facts of this case. This Court agrees.

In Office of Personnel Management v. Richmond, 496 U.S. 414, 415-16 (1990), the issue before the Court was whether erroneous advice regarding earned income given by a government employee to a disability benefits claimant could give rise to estoppel against the government. The Richmond Court held that, under the facts of the case, equitable estoppel could not be asserted against the government for payments of money from the Federal Treasury. See id. at 416. In reaching this conclusion, the Richmond Court stated that "equitable estoppel will not lie against the Government as it lies against private litigants." Id. at 419. The Richmond Court noted that although in its previous opinions it had referred to the *possibility* of equitable estoppel being available against the government when affirmative misconduct was involved, the Richmond Court pointed out that there had never been a case in which estoppel against the government for the payment of money was warranted. See id. at 421-22, 427. Instead, the Richmond Court stated that its "recent cases evince a most strict approach to estoppel claims involving public funds." Id. at 426.

The Wasserman entities do not cite to any case law to support their argument that Richmond does not apply to the facts in this case. Accordingly, the Court agrees with the Government and concludes that equitable estoppel is not an available affirmative defense in this case. See id. at 416; see also Shuford v. Fidelity National Property & Casualty Ins. Co., 508

11

F.3d 1337, 1342-43 (11th Cir. 2007)(stating that "[t]he Supreme Court has held that equitable estoppel is unavailable in a claim against the government for funds from the public treasury"); Sanz v. U.S. Security Ins. Co., 328 F.3d 1314, 1319-20 (11th Cir. 2003)(stating that "[t]he Supreme Court's decisions indicate that even if estoppel is available against the Government, it is warranted only if affirmative and egregious misconduct by government agents exists").

### 3. Affirmative Defendant #4: Laches

In their Fourth Affirmative Defense, the Wasserman entities assert that the Government's claims are barred under the doctrine of laches. The Government argues that it is entitled to summary judgment on this affirmative defense, because laches is not an available defense against the Government. This Court agrees.

The Supreme Court has stated that "[i]t is well settled that the United States is not . . . subject to the defense of laches in enforcing its rights." U.S. v. Summerlin, 310 U.S. 414, 416 (1940); see also Herman v. South Carolina National Bank, 140 F.3d 1413, 1427 (11th Cir. 1998). Thus, when the government "brings an enforcement action to protect the public interest, laches is not a defense." Securities & Exchange Commission v. Silverman, 328 Fed. Appx. 601, 605 (11th Cir. 2009)(citation omitted); U.S. v. Delgado, 321 F.3d 1338, 1349 (11th Cir. 2003)(noting that rare exceptions exist to the principle that the government is not subject to the defense of laches).

In responding to the Government's argument, the Wasserman entities cite to two non-binding district court cases from outside of the Eleventh Circuit. The Court is not persuaded by Wasserman's response. Accordingly, the Court agrees with Government and concludes that laches is not an available affirmative defense in this case.

### III.  Wasserman's Motion for Summary Judgment

Wasserman moves for summary judgment on Counts I, II, and III: (1) presentation of false claims regarding the pathology work, biopsies, E/M services, and adjacent tissue transfers; (2) presentation of false statements and records relating to the claims for pathology work, biopsies, E/M services, and adjacent tissue transfers; and (3) conspiracy to defraud the United States.  Specifically, Wasserman argues that there is no evidence to support these claims.  However, the Court concludes that the facts supporting these claims are in dispute, and as such, summary judgment is not warranted.

There is, however, one sub-issue that the Court can address—what type of conduct can be considered to support the Government's claim that Wasserman caused TPL to submit false claims and false records to Medicare.  Pursuant to 31 U.S.C. § 3729(a)(1)(A), any person who knowingly presents, *or causes to be presented*, a false or fraudulent claim for payment or approval is liable to the Government.  Likewise, pursuant to 31 U.S.C. § 3729(a)(1)(B) any person who knowingly makes, uses, *or causes to be made or used*, a false record or statement material to a false or fraudulent claim is liable to the Government.

Wasserman argues that it cannot be held liable for "causing" TPL's submission of the claims and records that are deemed to be false due to the alleged kickback arrangement.  Specifically, Wasserman argues that because there is no evidence that Wasserman participated in, or had control over, TPL's billings and submissions to Medicare, Wasserman cannot be held liable for causing TPL to submit anything to Medicare.  As explained below, Wasserman construes "causes" too narrowly.

One court has explained the proper interpretation of "causes" as follows:

> Generally, mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish liability under the FCA. Under § 3729(a)(1)'s requirement that a person "cause" a false claim to be presented, the appropriate focus of the inquiry is on "the specific conduct of the person from whom the Government seeks to collect." Thus, the appropriate inquiry under § 3729(a)(1) is whether that specific conduct *causes* the presentment of a false claim.
>
> The Third Circuit has borrowed traditional principles of tort law to analyze causation for damages under the FCA. Such an approach is useful in analyzing causation under § 3729 as well, and provides a familiar test—that of proximate causation—to determine whether there is a sufficient nexus between the conduct of the party and the ultimate presentation of the false claim to support liability under the FCA. Such a test separates the wheat from the chaff, allowing FCA claims to proceed against parties who can fairly be said to have caused a claim to be presented to the government, while winnowing out those claims with only attenuated links between the defendants' specific actions and the presentation of the false claim. Attempting to strike this same balance, the district court required "some sort of an affirmative action on the part of the defendants." We agree that a standard requiring more than mere passive acquiescence is most consistent with the purposes of the FCA. Furthermore, such a standard strikes the appropriate balance between shielding from liability parties who merely fail to prevent the fraudulent acts of others, and ensuring that liability attaches for "affirmative acts" that do cause or assist the presentation of a fraudulent claim.

U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 714-15 (10th Cir. 2006)(internal citations omitted). Likewise, another court has explained the proper interpretation of "causes" as follows:

> The FCA does not provide a special definition for causation . . . . Absent an FCA-specific definition of causation, the Court will apply common-law tort causation concepts[.] . . .
>
> [T]here are two questions that must be answered to determine if a defendant's conduct "caused" a plaintiff's injury. The first question is whether there was in fact some causal relationship between the conduct and the outcome. The *Restatement* expresses this test as whether the defendant's conduct was a "substantial factor" in

14

> producing the harm.  The second question is whether the
> circumstances and causal relationship are such that the law will
> impose liability on the defendant. Sometimes this is expressed as a
> foreseeability test[.]

See U.S. ex rel Franklin v. Parke-Davis, Division of Warner-Lambert Co., 2003 WL 22048255, at *4 (D. Mass. Aug. 22, 2003)(internal citations omitted).

Based on these cases, this Court rejects Wasserman's narrow interpretation of "causes." Instead, if the Government proves that a kickback arrangement existed and that the kickback arrangement was a substantial factor in bringing about TPL's submissions to Medicare and that TPL's submissions were a normal consequence of the situation created by the kickback arrangement, Wasserman could be found to have "caused" TPL's submissions to Medicare.  See U.S. ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 244-45 (10th Cir. 2004); see also Parke-Davis, 2003 WL 22048255; U.S. ex rel. Westmoreland v. Amgen, Inc., 738 F. Supp.2d 267, 277-79 (D. Mass. 2010).

## IV.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1) The Government's Motion for Summary Judgment (Doc. No. 120) is **GRANTED IN PART AND DENIED IN PART**: The motion is **GRANTED** to the extent that Court concludes that summary judgment is warranted on all of the Wasserman entities' affirmative defenses, except for their Eleventh Affirmative Defense (damages); otherwise, the motion is **DENIED**.

(2) Wasserman's Motion for Summary Judgment (Doc. No. 122) is **DENIED**.

(3) The pretrial conference that was scheduled for December 6, 2012 is hereby rescheduled to November 7, 2012.  The trial remains set on the Court's January

2013 trial calendar.

**DONE AND ORDERED** at Tampa, Florida, this 21st day of September, 2012.

SUSAN C. BUCKLEW
United States District Judge

Copies to:

All Parties and Counsel of Record